MATTHEW J. LOMBARD (SBN 239910)
LAW OFFICES OF MATTHEW J. LOMBARD
11400 West Olympic Boulevard, Suite 1500
Los Angeles, California 90064
Telephone (424) 371-5930
Facsimile (310) 392-9029
Email: mlombard@lombardlaw.net

Attorney for Defendant
ANTHONY LOUIS LAM

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ) | Case No. CR 19-00393(A)-3 |
|---|---|---|
| Plaintiff, | ) | **DEFENDANT'S SENTENCING MEMORANDUM, WITH EXHIBITS** |
| v. | ) | |
| ANTHONY LOUIS LAM, | ) | Date: August 27, 2020 |
| Defendant. | ) | Court: Hon. John A. Kronstadt |

Defendant ANTHONY LOUIS LAM, through counsel, hereby and herewith submits his Sentencing Memorandum, with exhibits.

Defendant reserves the opportunity to make additional comments through counsel at the sentencing hearing in this matter.

Date:  August 19, 2020          Respectfully submitted,

                                LAW OFFICES OF
                                MATTHEW J. LOMBARD

                        By      */s/ Matthew Lombard*
                                MATTHEW J. LOMBARD
                                Attorney for Defendant
                                ANTHONY LOUIS LAM

1

# I.

# OVERVIEW AND RECOMMENDED SENTENCE

Anthony Louis Lam, age 35, has pleaded guilty to conspiracy to distribute and possess with intent to distribute cocaine, in violation of 21 U.S.C. §§846, 841(a)(1), (b)(1)(A)(ii)(II). Anthony Lam was arrested on July 26, 2018 while picking up cocaine in Pomona, California for transport to Canada. He was indicted on the instant matter in the Central District of California in July of 2019.

Upon learning about the indictment, Mr. Lam, who is a Canadian citizen, arranged to self-surrender through his attorney. He has been in Federal custody since October of 2019.

Anthony Lam was 33 years old at the time of the offense conduct and has no prior criminal history. He has acknowledged his culpability and has consistently expressed his contrition to both family members and undersigned counsel. On August 24, 2020, Anthony will participate in a telephonic proffer to satisfy the fifth prong of the "safety valve" criteria set forth at 18 U.S.C. §3553(f) and U.S.S.G. §5C1.2.

In the Presentence Report (hererinafter PSR), the United State Probation Officer calculates a total offense level of 29, which at Criminal History Category I, results in an advisory guideline range of 87-108 months. Inasmuch as Anthony had not yet satisfied the fifth prong of the "safety valve" when the PSR was drafted, the Probation Officer recommends a mandatory minimum sentence of 120 months.

In its Sentencing Position (filed on August 13, 2020), the Government states that if Anthony does satisfy the fifth prong of the safety valve criteria, they will recommend that he receive the applicable 2-level guideline reduction as well as an additional 1-level downward variance based on his self-surrender. This would result in a total offense level of 26, which at CHC I corresponds to a guideline range of 63 to 78 months. The Government has agreed to recommend a sentence of 63 months, at the low-end of the advisory guideline range.

Anthony Lam was born in Trail, British Columbia, Canada. He has lived most of his life in Vancouver, British Columbia. His parents immigrated to Canada from Vietnam in the 1980s and struggled to assimilate to a new culture. They are traditional people who raised Anthony in a very strict manner. Anthony's parents speak little to no English and had difficulty communicating with Anthony, who has been more comfortable with English since the 5th or 6th grade. Because this parents both worked long hours, Anthony was raised primarily by his maternal grandmother, who also speaks little to no English.

As detailed in the body of this memorandum, Anthony has a longstanding gambling problem and his addiction to gambling was at its peak when he committed the instant offense. Although this certainly does not excuse his criminal conduct, Anthony foolishly convinced himself that acting as a drug courier would be an easy way to pay down his substantial gambling debts. He was never a manager or leader of the drug trafficking organization, nor was he privy to the overall scope and complexity of the conspiracy.

The totality of circumstances supports a sentence lower than the 63 months recommended by the Government. Anthony's arrest and conviction has been a great shock to his system and he has repeatedly expressed his determination to solve his gambling problem and other personal issues once and for all so that he can move on with his life in a positive direction. Factors to be considered in arriving at an appropriate sentence include the absence of any prior criminal history; Anthony's clear remorse and early self-surrender; and the fact that he will be deported to Canada and banned from ever entering the United States again.

Based on these factors, Anthony Lam, through counsel, respectfully requests a sentence of 41 months. Such a sanction would be "sufficient, but not greater than necessary" to satisfy the purposes of §3553(a)(2).

///

///

3

## II.

## COMMENTS ON THE ADVISORY GUIDELINES

Defendant Anthony Lam agrees with the Government's advisory guideline calculations, with the single exception that he believes he qualifies for the 2-level minor role reduction described at §3B1.2(b).

A. *The Reduction for Mitigated Role Pursuant to U.S.S.G §3B1.2 is Warranted*

Mr. Lam did not negotiate or broker any drug transactions. He did not stand to gain a substantial financial windfall because he had no proprietary interest in the conspiracy. His participation was that of a courier or "mule" who was recruited in Canada by an individual to whom he owed gambling debts. In his upcoming safety valve proffer, Anthony will provide detailed information concerning his participation in the offense, which was limited to picking up drugs from a similarly situated courier and then delivering them to yet another courier who would arrange to have the contraband transported to Canada. Anthony never opened the packages and he only stored the drugs until he was asked to pass them on to the next participant in the chain. He had no decision-making authority over where or when the contraband would be picked up or delivered.

A District Court's finding that a defendant qualifies for the minor role reduction is a factual determination subject to the clearly erroneous standard. United States v. Sanchez-Lopez, 879 F.2d 541, 557 (9th Cir. 1989). The sentencing guidelines specifically cite as an example of a person who may be entitled to a minor role adjustment:

> …a defendant who is convicted of a drug trafficking offense, *whose role in that offense was limited to transporting or storing drugs*…" [emphasis added].

This applies even where that defendant is held responsible only for the quantity of drugs he or she personally transported or stored. U.S.S.G. §3B1.2, Application Note 3(A). Application Note 3(c) further illuminates:

4

> For example, a defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks should be considered for an adjustment under this guideline.
>
> The fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative. Such a defendant may receive an adjustment under this guideline if he or she is substantially less culpable than the average participant in the criminal activity.

Moreover, the Ninth Circuit makes clear that a district court "should consider [the defendant's] culpability relative to the involvement of the other likely actors, such as the…supplier and the distributor," and that a defendant's role is to be compared with that of all the other actors who participated in the offense, not just with that of the defendants charged. Specifically rejecting the narrow view that co-participants must be defendants in the case, the Ninth Circuit observed:

> This narrow view cannot be squared with the Guidelines' minor participant provision's language or purpose. The Guidelines refer to minor "participants," not to minor "defendants." U.S.S.G. §3B1.2, comment (n.3). Furthermore, a narrow view produces arbitrary results: by ignoring the actions of other participants, it subjects less culpable defendants to longer sentences simply because their more involved co-conspirators managed to escape arrest or were tried separately. We see no reasons why the Guidelines would sanction such a regime, and we find confirmation in the language of §3B1.2 that the intent was not to do so.
>
> United States v. Rojas-Millan, 234 F.3d 464, 47072 (footnote omitted) (9th Cir. 2000).

The guidelines were modified on November 1, 2015 (see Amendment 794) to broaden the category of offender that would qualify for a mitigated role adjustment under Chapter 3, Part B.  In explaining the reason it formulated and adopted Amendment No. 794, the Sentencing Commission set forth:

> This amendment is a result of the Commission's study of §3B1.2 (Mitigating Role). The Commission conducted a review of cases involving low-level offenders, analyzed case law, and considered public comment and testimony. Overall, the study found that mitigating role is applied inconsistently and more sparingly than the Commission intended. In drug cases, the Commission's study confirmed that mitigating role is applied inconsistently to drug defendants who performed similar low-level functions…

Anthony Lam's participation places him as a less culpable participant consistent with the 2-level role reduction described at §3B1.2(b).  Granting this reduction would additionally produce a 2-level decrease for "role cap" pursuant to U.S.S.G. §2D1.1(a)(5)(i). This calculation would yield a total offense level of 22, at Criminal History Category I, and a low-end advisory guideline sentence of 41 months, as reflected in the chart below:

| | | |
|---|---|---|
| 1. | Base Offense Level [§§2D1.1(a)(5) & 2D1.1(c)(4)] | 32/30 |
| 2. | Safety Valve [§2D.1.1(b)(18) and 5C1.2] | -2 |
| 3. | Minor Role [§3B1.2(b)] | -2 |
| 4. | Acceptance of Responsibility [§3E1.1(a)&(b)] | -3 |
| 5. | Variance for Voluntary Self-Surrender [§5K3.1 & §3553] | -1 |
| | Total Offense Level | 22 |

-----------------------------------------------------------------

| | |
|---|---:|
| Criminal History Category | I |
| Advisory Guideline Range | 41-51 months |
| Recommended Sentence | 41 months |

B. *The Nature and Circumstances of the Offense are Inextricably Linked to the Defendant's Gambling Problem and the Ensuing Debt He Incurred*

Anthony was exposed to gambling after his family moved from his hometown of Trail, population approximately 8,000, to the city of Vancouver, which is hub of the third-largest metropolitan area in Canada. During his formative years, Anthony's parents did not permit him to socialize with other children, which meant, in effect, that he had no friends. His family rarely travelled outside of Trail and lectured Anthony on how the big city (specifically Vancouver) was filled with bad influences. Their concern grew exponentially after they themselves moved to Vancouver to open a new upholstery business there. Some of the friends Anthony made after the move to Vancouver were heavily involved in online and casino gambling.[1] Anthony began gambling on his own when he was in college and afterwards. What started as a casual pastime grew -- slowly but steadily -- into a serious addiction that led to unmanageable debts, which, in turn, led to the self-destructive and illegal activity that brings him before this Court for sentencing.

For many years pathological gambling has been identified as a distinct diagnostic entity that can be treated. The third edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM), published in 1980, described "Pathological Gambling" as a "chronic and progressive failure to resist impulses to gamble and gambling behavior that compromises, disrupts, or damages personal, family, or vocational pursuits." That edition of the manual noted that "problems arise as a result of the gambling leading to

---

[1] As in the United States, problem gambling is prevalent in Asian immigrant communities in Canada. Casinos cater specifically to these communities with special promotions and targeted advertising:

https://nationalpost.com/news/canada/is-it-ethical-for-canadian-casinos-to-so-aggressively-target-asians-who-knows-theyre-not-talking.

7

an intensification of the gambling behavior," and added that "characteristic problems include... fraud...income tax evasion [and] no serious attempt to budget money." The fifth edition of the DSM, published in 2013, reclassified "Pathological Gambling" as "Gambling Disorder" and listed it under "Substance-related and Addictive Disorders" rather than "Impulse-Control Disorders."

> An important departure for DSM-5 from its predecessors was the inclusion of gambling disorder in the chapter on Substance-Related and Addictive Disorders. Gambling disorder was formerly listed as pathological gambling in the section on impulse control disorders not elsewhere classified. Gambling disorder was relocated because of evidence showing similarities in phenomenology and biology to substance use disorders. For example, many people with gambling disorder report an urge or craving state prior to gambling, as do individuals with substance addictions; gambling often decreases anxiety and results in a positive mood state or "high," similar to substance intoxication; and emotional dysregulation often contributes to gambling cravings just as with alcohol or drug cravings.[2]

Henry Lesieur and Robert Custer, leading experts on the subject, in their article, "Pathological Gambling: Roots, Phases, and Treatment," in the Annals of American Psychology and Social Sciences, describe the three phases of the compulsive gambler's career. It starts with the "Winning Stage," in which the gambler may have a modest taste of success and is gripped by its euphoria. Next comes the "Losing Stage" where he begins borrowing heavily or obtains money through any means available to get back

---

[2] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5328289/.

https://www.ncbi.nlm.nih.gov/books/NBK230632/#:~:text=Disorders%20of%20Impulse%20Control%20Not,%2C%20family%2C%20or%20vocational%20pursuits.

8

to the winning stage. The final stage is referred to as the "Desperation Phase" in which the compulsive gambler takes great risks to continue gambling.[3]

U.S.S.G. §5H1.4 precludes addiction to gambling as a rationale for requesting a formal downward departure. 18 U.S.C. §3553(a)(1), however, provides an appropriate remedy. After his arrest on July 26, 2018, Anthony returned to Canada, did not resume gambling, and paid off the bulk of his debt. In consideration of these positive changes, Anthony Lam respectfully requests, through counsel, that he be granted sentencing relief under 18 U.S.C. §3553(a)(1), based on the clear link between his gambling addiction and his participation in the instant offense, as well as his subsequent positive efforts toward self-rehabilitation.

## III.
## DEFENDANT'S HISTORY AND PERSONAL CHARACTERISTICS SUPPORT THE REQUESTED SENTENCE

In Gall v. United States, 552 U.S. 38 (2007), the U.S. Supreme Court advised that in addition to considering the Guidelines, the "district court should…consider all the 3533(a) factors to determine whether they support the sentence requested by a party… [The court] must make an individualized assessment based on the facts presented." Gall at 596-597.

Furthermore, "'[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" Pepper v. United States, 562 U.S. 476 (2011), quoting Koon v. United States, 518 U.S. 81, 113 (1996). The Supreme Court has found that "[u]nderlying this tradition is the principle that 'the punishment should fit the offender and not merely the crime.'" Id. at 1240, quoting Williams v. People of the State of New York, 337 U.S. 241, 247 (1949). The Supreme Court has "emphasized that [h]ighly relevant -- if not essential -- to the selection of an

---

[3] https://journals.sagepub.com/doi/10.1177/0002716284474001013

9

appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics."

The following social history information is presented in the spirit of 18 U.S.C. §3661 which sets forth:

> No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.

A. *Family Background and Upbringing*

Anthony Lam was born on May 13, 1985 in Trail, British Columbia. His father Thuong Thanh Lam, 61, and his mother Van Lam, 55, are natives of Vietnam. They are self-employed upholstery workers who have worked together for decades. His parents now live in Surrey, British Columbia.

Anthony has two siblings. Amanda Lam, 33, is a mortgage consultant who resides in Vancouver. His younger brother Andrew Lam, 26, works with his parents in the family upholstery business. Anthony has never been married and does not have children. He has received no visits from anyone outside of his legal team since he surrendered on October 21, 2019.

Anthony's parents left Vietnam in the 1980s as refugees, joining the approximately 800,000 "boat people" who fled that country between 1975 and 1995. They settled in the small town of Trail in Canada. His parents have never learned to speak more than minimal English. They worked long hours at their family upholstery business and Anthony was largely raised by his maternal grandparents, especially his grandmother. He did not begin to learn English until he was in third or fourth grade. Anthony was in sixth grade when his grandfather left the upholstery business that he had founded to Anthony's parents. Anthony's family then moved above the store, further reducing the line between his parents' working and personal lives. His parents

10

never adapted to Canadian culture, and they were always quite strict and overly protective of Anthony.  Even now, due to the language barrier, Anthony does not have much communication with his parents.  Although he still  understands basic Vietnamese, he no longer speaks the language well.

        In an appended letter, Anthony's sister Amanda Lam recounts:

> Growing up our relationship would be considered relatively normal as a brother and sister, and because we were so close in age, at times we got along well and just like any other siblings, we would have our disagreements.  We grew up in a strict household, having immigrant parents was difficult; but we knew that at the end of the day, we always had each other's back.  Growing up in a small town and being one of the only Asian families, growing through high school was a bit of a challenge for me.  I was not one of the popular kids, and didn't have many friends which often led to [me] being picked on at school. Anthony was always protective of me and he always played the big brother role.

B.    <u>Education and Employment</u>

        School was challenging for Anthony because he did not begin to actively learn English until he was in the third or fourth grade and he was placed in slower learning classes for several years.  He learned English to some degree from speaking with classmates but primarily on his own from watching English-language television programs.

        Anthony graduated from high school in Trail in 2003. He was on the hockey team for several years and earned average grades.  At age 20, he enrolled in college but dropped out after one semester because he could not afford tuition.

///

///

In an appended letter to the Court, the defendant's uncle Vu Tran notes:

> After moving to Surrey, Anthony met new friends and one who recently moved from Calgary, AB. The friend who had moved from Calgary was involved with the wrong crowd in Calgary, so the family thought sending him to Surrey away from the crowd he was associating himself with would help him turn his life around. Unfortunately, instead of him turning his life around, he influenced Anthony in the wrong way. Anthony began to change and started distancing himself from his mom and siblings, she tried countless times to get through to him but his friend's influence was too strong. Anthony did love his family, and an example of his loving character would be when his grandmother was ill and not doing well in the hospital, he was the only grandchild that stayed overnight with her at the hospital.

Between the ages of 21 and 23, Anthony worked for Amcore Packing in Vancouver as a line-worker packing soda bottles. At age 24 he took a job as a salesman and stock room worker for Champs Sports Mall in Vancouver. Anthony has had high blood pressure since his 20s. He turned to physical exercise in an attempt to manage and control this condition, so much so that he ultimately began working as a personal trainer for others.

From 2015 to 2017, Anthony was self-employed as a personal trainer in Vancouver. He founded True Rebolt Fitness, a company he operated from his home. Anthony charged $80 to $100 hourly when he could get clients and made an adequate living. He aspires to open his own gym in Vancouver upon his release from custody.

///

## IV.

## DEFENDANT'S REMORSE

Anthony Lam deeply regrets his involvement in this conspiracy, particularly because of the pain his arrest and conviction have caused his parents. In his letter he states:

> I was born and raised in British Columbia, Canada. My parents immigrated to Canada from Vietnam in the 1980's. Through the hardship of my parents and their dedicated hard work, they gave me and my two younger siblings a life full of opportunities. I learned the trade of upholstery at a young age, along with the importance of hard work.
>
> Unfortunately, I began gambling in my 20's and what seemed to be just something that I did to spend time with my friends became a problem. I began taking cash advances on my credit cards, borrowing money from friends, and paying high interest on my debt. This is how I met the person who recruited me to come to Los Angeles and work as a drug courier for him.
>
> I would like to take this opportunity to make my sincerest apologies to the United States of America for acting on a crime that I should have never been a part of. It has been very disheartening to know the pain and suffering and stress I have put on my parents. In my time of confinement, I have realized how much I value my life and [am] incredibly grateful for the amount of support and love I have received from my family and friends.
>
> I will commit fully to my rehabilitation so that I can come out of this time as a better person.

## V.

## THE BOP HAS PROVEN ITSELF UNABLE TO PROVIDE ADEQUATE AND EFFECTIVE PREVENTION AND PROTECTION FOR INMATES DURING THE COVID-19 PANDEMIC

The deadly arrival of the coronavirus in our jails and prisons presents an incentive to find alternatives to incarceration whenever possible. The terror of contracting COVID-19 disease haunts all inmates, as well as their loved ones, and the strain of coping with that fear constitutes an additional form of retribution that is well beyond the norm. Mr. Lam and his family are of course concerned that he might contract the virus, as its rapid spread in jails and prisons throughout the United States is well-documented. It is now abundantly clear that the COVID-19 pandemic is not going away anytime soon, and it is hoped that the court will take this into consideration at sentencing.

On July 21, 2020 the New York Times reported:

> Coronavirus outbreaks have been traced to funerals, fast food restaurants, cruise ships and Navy vessels. But most of the biggest known clusters have been in nursing homes, food processing plants and *correctional facilities*, all places where people are packed in close quarters with little opportunity for social distancing [emphasis added]…

In American jails and prisons, more than 100,000 people have been infected and at least 763 inmates and correctional officers have died. During interviews with dozens of inmates across the country, many said they were frightened and frustrated by what prison officials have acknowledged has been an uneven response to the virus.

"Cluster" refers to an aggregation of cases of a disease. A coronavirus cluster occurs when there is a concentration of infections in the same area at the same time. Hundreds of thousands of cases in the United States have been traced to such clusters. The New York Times keeps a running tally of coronavirus cases, including all

identified clusters in the country. On July 21st all of the top ten clusters were in correctional facilities. Of the total number of clusters in the United States over 15% are in jails and prisons and it is anticipated that number will increase for many months.[4]

The arrival of a highly infectious, deadly virus in a closed and crowded prison setting can in short order become a life-threatening disaster in which inmates are virtually defenseless from the disease, and at the mercy of prison officials who lack the resources or expertise to assist them. All it takes is one prisoner or guard with an undiagnosed case of COVID-19 to ignite a tinderbox. For asymptomatic inmates (or staff), even two-week quarantines are ineffective because once released to the general population they may still be able to transmit the virus. Avoiding close proximity to others ("social distancing") is impossible, and there is no access to alcohol-based sanitizer (considered contraband) and very limited soap for handwashing.

Both Congress and Attorney General Barr have urged the BOP to take more aggressive measures, namely depopulation by transfer to home confinement, to mitigate the virus in its facilities. See Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (March 27, 2020). See also Memorandum from Attorney General to Director of Bureau of Prisons (April 3, 2020).[5]

## VI.

## LETTERS FROM CONCERNED PARTIES

Letters of support have been submitted on Anthony's behalf from friends and family members. All of the letters are attached and some are excerpted below:

Anthony's sister Amanda Lam writes:

---

[4] https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html?searchResultPosition=2

[5] Memorandum from Attorney General to Director of Bureau of Prisons (April 3, 2020) ("4/3/2020 Barr Memo"), https://tinyurl.com/yx5qp72s

> I know my brother knows the extent of his faults and all his wrong doings. I know he is a man who will be able to change his life and live a life of purpose and gratitude.
>
> In the event that Anthony is sentenced for a long time, the effect of my family especially our mom will be impactful. She will be suffering an internal loss and sadness that only a mother can understand for her son.

The defendant's uncle Vu Tran offers:

> I truly believe that if Anthony was not influenced by the wrong crowd, he would have remained a straight arrow like his cousins who are all graduates of Universities. Anthony's incarceration will be devastating to the entire family especially his parents. Anthony is the first born out of the 12 grandchildren, and we are a very close [k]nit family who are very supportive of each other, to see Anthony become influenced this way has been heartbreaking and devastating to our family. Our hope is that Anthony is able to receive a second chance in life to become a responsible contributing citizen in the community. If Antony is given a reduced sentence it would allow him to have the opportunity to turn his life around…

Anthony's brother Andrew Lam writes:

> I know Anthony is having a tough time…and is sorry for his actions. I know he feels bad for what he's putting my parents through. Anthony knows our grandma is looking down on him and is ashamed of what has happened, but I know he will be strong and be sorry for what he has done. Anthony will learn from this mistake and will be a different man whenever

> he comes back to our family. I can't imagine the pain and
> mental pressure he is dealing with, but I just hope he knows
> he has his family supporting him and loving him no matter
> what. Our mom is taking this to heart and she's embarrassed
> and sad every day, she misses Anthony a lot. Our mother
> feels like she let everyone down, because Anthony did a
> mistake and she feels like she lead him the wrong way, but
> only Anthony can correct it now. I know this time away from
> his family he is thinking about his mistake and regrets every
> single minute of it. I wish this didn't happen, because we
> seemed to be closer again and be like brothers again.

## VII.
## CONCLUSION

Anthony Lam understands that like any defendant convicted of a serious offense, he is in a tenuous position to make a request for leniency. He can only ask that the Court recognize that he is chastened and contrite and, more importantly, that he is not the same immature and selfish young man he was just a few years ago. At this point, he poses no threat to society. He will be deported and banned from ever returning to the United States, with the specter of serving additional prison time for illegal reentry were he ever to violate this condition. There is simply no compelling societal interest for him to be incarcerated for more than the requested 41 months, particularly when our Federal prisons are buckling under the coronavirus outbreak with over 10,000 Federal inmates sickened thus far and more than one hundred dead. The only real solution -- social distancing -- is difficult if not impossible to achieve unless the population of non-violent inmates inside the BOP is substantially reduced.

On the grounds discussed in this memorandum and its attachments, the Court is asked to impose a sentence that reflects moderation, compassion, and recognition of the difficult and painful situation in which this otherwise decent young man, through his

mistakes and shortsightedness, has placed himself and his loved ones.  In seeking the requested sentence, defendant and counsel are mindful of the United States Supreme Court's holding in <u>Koon v. United States</u>, 518 U.S. at 96, 116, S.Ct. at 2047-48:

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.  We do not understand it to have been the congressional purpose to withdraw all sentencing discretion from the United States District Judge.  Discretion is reserved within the Sentencing Guidelines and reflected by the standard of appellate review we adopt.

Anthony Lam has made huge strides in his attitude, mind-set, and maturation since his arrest.  On all of the aforementioned grounds, it is submitted that the requested 41-month sentence would be "sufficient, but not greater than necessary" to effectuate justice in this matter.

Date:   August 19, 2020						Respectfully submitted,

LAW OFFICES OF
MATTHEW J. LOMBARD


								By	  /s/ Matthew Lombard
									MATTHEW J. LOMBARD
									Attorney for Defendant
									ANTHONY LOUIS LAM